# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**HAVRE AERIE #166 EAGLES,**                          Case No. **12-60679-11**

Debtor.

## *MEMORANDUM OF DECISION*

At Butte in said District this 20th day of March, 2013.

In this small business Chapter 11 case, after due notice a hearing was held at Great Falls on December 7, 2012, on final approval of Debtor's Disclosure Statement (Docket No. 60), on confirmation of the Debtor's Chapter 11 Plan (Dkt. 59), and objections thereto filed by creditor KayCee Groven ("Groven")[1]. The parties appeared at the hearing represented by counsel. Testimony of witnesses was heard and exhibits were admitted. At the conclusion of the parties' cases-in-chief the Court closed the record and took the pending matters under advisement. After review of the record and applicable law, these matter are ready for decision. For the reasons set forth below Groven's objections will be overruled, final approval will be granted to Debtor's Disclosure Statement; and Debtor's Chapter 11 Plan will be confirmed by separate Order.

---

[1]Debtor's Objection to Groven's Proof of Claim No. 2 also was heard on December 7, 2012, together with the trial in Adversary Proceeding No. 12-00027. Those matters have been addressed by a separate memorandum of decision in Adv. 12-27, entered on March 14, 2013.

1

This Court has jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a). Confirmation of Debtor's Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

The Debtor was represented at the hearing on December 7, 2012, by attorney Steven M. Johnson of Church, Harris, Johnson & Williams, P.C., of Great Falls.  Groven was represented by attorney Philip A. Hohenlohe of Hohenlohe, Jones, PLLP, Helena, Montana.  Debtor's general manager Thomas M. Farnham ("Farnham") testified, along with Debtor's accountant James C. Kato ("Kato") and consultant J.T. Korkow ("Korkow").  Groven called no witnesses and offered no exhibits.  Debtor's Exhibits ("Ex.") 1, 2, 3, 4, 5, 7, 8, 11, and 16 were admitted into evidence without objection.

A stipulation between Debtor and creditor Independence Bank (Dkt. 70) was filed and approved prior to the hearing, providing for treatment of Independence Bank's Class I claim in Debtor's Plan, in return for Independence Bank's consent and affirmative vote in favor of confirmation.  No objection other than Groven's was filed to final approval of the Disclosure Statement or confirmation, and no other appearance was made at the hearing in opposition.

The ballot report reflects and the Court finds that the only creditor in Class I, Independence Bank, submitted a ballot accepting the Plan in the amount of $118,000.  Groven submitted the only ballot in Class II rejecting the Plan.  Thus, the Court finds that at least one class of impaired claims has accepted the plan in satisfaction of 11 U.S.C. § 1129(a)(10).

### FACTS & PROCEDURAL HISTORY

The Debtor Havre Aerie #166 Eagles (hereinafter "Havre Eagles" or "Debtor") is a nonprofit organization affiliated with the national Fraternal Order of Eagles, and which owns and operates a bar and clubhouse in Havre, Montana.  Groven was an employee of the Havre Eagles.

**National Eagles.**

There are approximately 4,000 Eagles Clubs in the United States under the Grand Aerie Fraternal Order of Eagles ("Grand Aerie").  Farnham testified that the Grand Aerie owns no ownership interest in the Debtor, although the Debtor falls under the guidelines issued by the Grand Aerie.

The national "Grand Aerie Articles of Incorporation Constitution and Statutes" for 2009[2] were admitted into evidence as Ex. 11, without objection.  For purposes of the instant contested matter, Section 111.3 of the Grand Aerie Statutes provides:

> (a) No part of the Benefit Fund shall be used or appropriated for any purpose other than for the payment of the Grand Aerie per capita tax, which shall include the subscription fee to the Eagle Magazine, for State or Provincial Aerie per capita tax, for the payment of sick and funeral benefits, in accordance with the By-Laws of the Aerie, and for payment of all committed funds received for the specific uses and purposes as set forth in the preceding section.
>
> (b) *All moneys deposited in the Benefit Fund shall be trust funds, to be used for the specific purpose declared and for no other purpose,* and no part thereof shall be subject to seizure by a creditor of the Local Aerie by virtue of any writ of attachment, execution, lien or any other proceeding in law or equity against the property or assets of the Aerie.

Ex. 11 (emphasis added).

**Havre Eagles.**

Farnham testified that the Debtor is a § 501(c)(3) nonprofit corporation incorporated in Montana in 1964.  He testified that Havre Eagles is a member in good standing in the Grand Aerie, and that its charter has not been suspended or forfeited.  Havre has no ownership interest in the National Grand Aerie Eagles organization, although it falls under the national guidelines,

---

[2]Farnham testified that he has not yet received the most recent version from the Grand Aerie yet.

3

and the Grand Aerie does not own stock in the Havre Eagles.

Havre Eagles owns and operates a bar in Havre which is open to the public as well as members and guests. Farnham testified that the Debtor's revenue is mainly from the sale of beverages, functions, and poker machines. Debtor sells limited food such as french fries to its patrons. Debtor rents its hall out to the public for wedding receptions, and the Havre Jaycees meet in the Debtor's basement. There is a separately chartered women's auxiliary organization which, Farnham testified, owns certain appliances in the Debtor's kitchen and uses the Debtor's facilities. Once each quarter Havre Eagles holds a weekend dinner which is free for its members, and a Thursday night dinner is held with volunteer help.

Farnham has been the general manager of the Havre Aerie #166 Eagles in Havre for 10 years, and he expects to remain general manager for the future. He has also held all other offices of the organization, and he testified that he is responsible for the bookkeeping.

Farnham testified that the Debtor has no shareholders but has members, and does not pay any dividends to shareholders. Havre Eagles is governed by a 5-member board of trustees who are selected from former presidents or officers. Farnham testified that the trustees are eligible for payment of $5 per meeting attended, but that payment is often waived.

Debtor's bylaws provide for small salaries for the officers of Havre Eagles, ranging from $4 per year for the president and vice-president, to $20 per month for the Aerie Auditor. Farnham testified that, basically, the officers donate their time to the club. He testified that the function of the Havre Eagles is to make enough profit to pay its bills, and at each club meeting the Debtor donates to community fund raisers.

Farnham testified that the Debtor has 10 employees, but one passed away recently. Four

4

of its employees are female. The Bylaws authorize salaries for employees such as bartenders, bar maids and one janitor. Farnham's his salary is approximately $2,000 per month, and he has not had a raise in 3 years.

Farnham testified that the Debtor has two types of memberships: Social members and Beneficial members. Farnham testified that social members pay the Debtor $23 per year. Beneficial members pay an additional $10 per year and in return get a "death benefit" of up to $250. Farnham testified that approximately half of the Havre Eagles members are benefit members, and that the number of benefit members fluctuates. At the beginning of 2012 there were 162 benefit members, and now there are 145 because of member deaths during the year. Farnham testified that the number of benefit members multiplied by the $250 maximum death benefit must be preserved in the trust accounts

Farnham testified that the funds for the funeral benefit are held in trust, and that Section 5.1 of the Bylaws require that Benefit funds be used to pay death benefits. On cross examination Farnham repeated that the funeral benefit funds are held in trust and are not available to pay creditors, including Groven. On cross examination Farnham admitted that the By-Laws of the Havre Eagles do not say the word "trust." However, Section 111.3 of the Grand Aerie Statutes, Ex. 11, quoted above provides: "All moneys deposited in the Benefit Fund shall be trust funds, to be used for the specific purpose declared and for no other purpose."

Farnham testified that the Debtor has never been dissolved, suspended or threatened with suspension by the National Eagles organization, and is a member in good standing and current on its dues, with the last dues check mailed to National Eagles on December 5, 2012. Later he amended that answer in the aftermath of Groven's sexual harassment claim, as discussed below.

5

Farnham stated that the Havre Eagles supports local charities by donating the Eagles hall for events and by donating cash.  Farnham testified that Havre Eagles is the hub for the members' social lives, and that a couple of fund raisers each month are held at the Debtor by various community organizations.

Farnham described the scope of his duties as manager as hiring and firing the Debtor's employees, scheduling, and overseeing the Debtor's finances.  He testified that the Havre Eagles generates balance sheets and profit and loss statements under standards issued by the national organization.  Ex. 2 are several years of profit and loss statements for Havre Eagles generated from the Havre Eagles Quickbooks software program.  Farnham testified that he sends a balance sheet and profit and loss statement for the Havre Eagles to the national organization each month.  Ex. 4 is a balance sheet comparison of the Havre Eagles as of May 31, 2012, and comparison with the previous year.  Farnham testified that Ex. 4 was generated from the Debtor's Quickbooks program.

Farnham testified that if the Havre Aerie's charter were revoked by the Grand Aerie, its property would revert to the Grand Aerie as second owner.  In addition the Grand Aerie is the named insured on the Debtor's insurance policy.

**Groven Lawsuit.**

Farnham testified that the Havre Eagles hired legal counsel in 2009 to defend it against sexual harassment charges which Groven filed with the Montana Human Rights Commission.  An administrative hearing officer heard the complaint.  Farnham admitted that, prior to entry of Groven's judgment, the administrative hearing officer concluded that he lacked credibility.  After a decision was appealed to the state district court, judgment was entered against Havre Eagles in

6

the Montana Twelfth Judicial District Court, Hill County, in the total amount of $290,780.75.
Farnham testified that the Debtor has no dispute with the amount of the judgment in Ex. 14. He
testified that, after entry of the judgment, Groven's attorney levied against the Havre Eagles'
bank account.

Farnham testified on cross examination that the hearing officer ordered him to avoid
being alone with any female employee, with which he stated he has complied, and to come up
with a plan to avoid sexual harassment in the future. He testified that, as result of an order and
judgment from the Human Rights Commission, the Havre Eagles amended its policy manual to
prevent a recurrence of harassment, and established a grievance committee where employees
could report harassment. Farnham testified that the Debtor is in compliance with the Human
Rights Commission's orders, that female employees now are told that Farnham may not be alone
with them, that he has not been alone with any of them since, and that none of the other
employees have complained about harassment since.

Farnham testified that Groven's attorney went to the National Organization to request
discipline. He testified that he and another employee were suspended for a period of 4 years, and
the Havre Eagles charter was suspended for a short time, but was reinstated after it disclosed the
lawsuit. At present, Farnham testified, Havre Eagles is not suspended or dissolved.

Debtor's accountant, CPA James Kato testified that he reviewed the Debtor's recent
financial statements and balance sheets in order to give opinion testimony regarding whether the
Debtor was rendered insolvent on the date of entry of the judgment in Groven's favor. Kato
testified that he reviewed Ex. 4, the Havre Eagles balance sheet comparison of years ending May
31, 2011, and May 31, 2012, and that he verified the numbers on Ex. 4 which came from

Debtor's Quickbooks by cross referencing the numbers with Debtor's bank statements.

Kato testified that he took the assets & liabilities from Ex. 4, and made adjustments in preparing Ex. 3, a balance sheet dated May 31, 2012, showing revised balances after adding in Groven's $290,780.75 judgment. Kato testified that Ex. 3 shows that as of May 31, 2012, the Debtor had total assets in the amount of $266,155.74, and total liabilities in the amount of $398,393.61, for a negative net asset in the amount of $132,237.87. Debtor's counsel asked Kato for his opinion on whether the Havre Eagles was insolvent on May 31, 2012, and Kato answered "Yes" based on the total liabilities being greater than the total assets.

The Court asked how it could make a finding that Havre Eagles was insolvent[3] on April 19, 2012, when Groven's judgment was entered, instead of May 31, 2012. Under direct examination by Debtor's attorney on that point, Kato testified that in his opinion Havre Eagles was insolvent on April 19, 2012, based on his investigation if Groven's judgment is taken into account. When asked on what basis he formed his opinion, Kato testified that the assets of Havre Eagles could not have been that much greater on April 19, 2012, nor could the assets have changed that much in the time period from April 19, 2012, to May 31, 2012, based on his investigation of the Debtor's financial records. Under cross examination, Kato testified that he is able to verify if Havre Eagles spent money from April 19, 2012, to May 31, 2012, by checking the bank statements.

On cross examination Groven's counsel asked Kato about Ex. 3 and the negative assets number of $132,237.87. Kato admitted that Ex. 3 does not show any value for the amount of the

---

[3]The issue of insolvency arose in Adversary Proceeding No. 12-00027. That matter was decided by Memorandum of Decision and Judgment entered on March 14, 2013, which avoided Groven's judicial lien as a preference under 11 U.S.C. § 547(b).

Debtor's personal property, other than $62,500 for the liquor license, and he admitted that if the value of Debtor's other personal property was included the shortfall in assets would be reduced. After asking Kato about the asset values on Ex. 3 and Debtor's amended Schedules on Ex. 7[4], Groven's counsel asked Kato what the approximate value of Havre Eagles' personal property excluding the liquor license and the DAD account. Kato answered that the remaining value of Havre Eagles' personal property would be approximately $30,000, and that if that amount were added to Havre Eagles' total assets on Ex. 3 for May 31, 2012, the total assets would increase to $296,155.74. On redirect examination by Debtor's attorney, Kato testified that increasing the total assets of Havre Eagles on April 19, 2012, by $30,000 to account for personal property would still result in its liabilities exceeding its assets.

**Case No. 12-60679-11.**

Debtor filed a voluntary Chapter 11 petition on April 27, 2012, and filed its Schedules (Ex. 8) and Statement of Financial Affairs on May 11, 2012, listing assets totaling $192,590.70 in value and total liabilities of $403,237.90. Farnham testified that he prepared the Schedules and monthly operating reports ("MOR").

Schedule A lists the real property at 202 First Street in Havre with a current value stated in the amount of $64,000, securing a claim stated in the sum of $104,708.41. Schedule B lists personal property having a total value of $128,590.70, including a Montana all beverage liquor license with a stated value of $60,000, and lists at item 2 several accounts and funds. Two

---

[4]Ex. 7, amended Schedule F, lists the total value of Debtor's personal property assets as $134,375.70. On redirect examination by Debtors attorney, Kato testified that deducting the value of the liquor license ($62,500), and DAD account ($16,325.05 and $23,024.37) from the total on amended Schedule B would reduce the total by more than $100,000.

accounts listed at item 2 of Schedule B are described as: "13000 DA Davidson CEF Benefit, funds held in trust – not estate property" in the sum of $16,325.05; and "15020 DA Davidson Benefit Fund, funds held in trust – not estate property" in the sum of $23,024.37. Ex. 8. Item 28 of Schedule B lists the Debtor's office equipment, furnishings, appliances, supplies and personal property over two pages.

Debtor filed amended Schedules on November 30, 2012, before the hearing on confirmation. Amended Schedule A on Ex. 7 lists an increased value for the Debtor's real estate in the amount of $132,500.00. Farnham testified that the new value is more than twice the original value, and was reached by stipulation with Groven's attorney after two appraisals were performed.

Farnham testified that the original Schedule B was missing certain items about which Groven's attorney asked him at the § 341(a) meeting of creditors. Ex. 7 are the amended Schedules. The summary of assets and liabilities shown on Ex. 7 are $266,875.70 in assets and $416,529.49 in liabilities. Farnham testified at the hearing that those figures are accurate. He testified that the 2 accounts at item 2 at DA Davidson, as in the original Schedule B, are earmarked benefits for the Havre Eagles benefit members and are not estate property. He testified that item 28 of Schedule B was amended to add several items which were missing and had been asked about by Groven's attorney. Among the items missing from the original Schedule B were a Karaoke computer, speakers and microphone which is listed on Ex. 7 at a value of $2,000, but was originally valued at $100 on Ex. 8. Debtor also added a painting to amended Schedule B with a value of $200.00, although Farnham testified he did not have it appraised. The value of the liquor license was increased to $62,500 at item 23 on Ex. 7, which is

10

the stipulated fair market value for the liquor license.

Three cash registers were added to the amended Schedule B with a value of $300.  A coffee maker was added with a value of $10.  Farnham was asked about this entry on cross examination because of an "Asset Depreciation Short Report" on the comparative balance sheet, Ex. 4, which has a line entry for a coffee maker.  Ex. 4 states that the coffee maker was acquired in 1979 for a cost of $900, and has been fully depreciated down to $0.  Farnham testified that the coffee maker listed in Ex. 4 was removed from the Havre Eagles bar four years ago, and the coffee maker on amended Schedule B, Ex. 7, is a different one.

A line entry on Ex. 7 for "7 Beer Signs (do not belong to Debtor)" was added at a value of $0.  Farnham testified that they signs were given to Debtor by local beer distributors and have no value.  "Flags and vests" were added at a value of $0.  Farnham testified that they are no longer used and have no value, and the flags are owned by the auxiliary.  "Piano (does not belong to Debtor)" was added at $0.  Farnham testified that the piano is not owned by the Debtor. Farnham was asked on cross examination about the $0 value given for a 16 ft. bar cooler.  He answered that the bar cooler has been at the Havre Eagles club forever.  He said that it still operates but the Debtor cannot replace parts for it, and he has no idea what it is worth.

The total value stated for amended Schedule B is $134,375.70, which Farnham testified is the correct total value and reflects all of the Debtor's personal property, which is less than $6,000 more than the $128,590.70 in total value on the original Schedule B (Ex. 8).  On cross examination Farnham admitted that four old wooded "altar stations" were left out of the amended Schedule B.  He described them as 2 foot by 2 foot by 4 foot podiums where the Eagles used to perform rituals, and that they are owned by the auxiliary.  Ex. 4 has a line entry for "alter

11

stations" acquired in 1961 for $300, which have been fully depreciated down to a value of $0.

He testified that he omitted them from Schedule B by oversight because they were in the

basement and unused, and estimated that they have a value of perhaps $5 each[5].  On re-cross

examination Farnham testified that there were no other items in the basement besides the altars

which were omitted from Schedule B.

Schedule D lists secured claims of Independence Bank in the amount of $105,804.97,

with an unsecured portion of $40,000; and Groven's claim stated in the amount of $290,780.75,

secured by a judgment lien acquired 4/19/2012 and described as "Voidable as preferential

transfer."  Schedule F lists unsecured nonpriority claims in the total amount of $298,529.49, of

which Groven's $290,780.75 claim is by far the largest.

Groven filed her Proof of Claim No. 2 on July 2, 2012, asserting a claim in the amount of

$292,368.08, including interest and attorney fees, secured by a judgment lien on the Debtor's

property, which she valued at $479,628.  Attached to Claim 2 are the final agency decision,

district court orders and her judgment and transcript of judgment, and an itemization of fees.

Ex. 5 are Debtor's Monthly Operating Reports ("MOR"), and also includes bank

statements and a statement from DA Davidson dated 10/31/12 under the title "Benefit Fund 1-31-

80" with a total account value as of 10/31/12 in the sum of $38,261.99, an increase from the

September value in the amount of $383.47 due to interest accrual.  Farnham testified that he

prepared the Debtor's MOR's, and that the $38,261.99 in the DA Davidson account are trust

funds earmarked for death benefits, and the principal cannot be used for anything except for

benefit members funeral benefits.  On re-cross examination Farnham admitted that he has in the

---

[5]Farnham agreed to amend Schedule B again to add the 4 altars.

past deposited some non-benefit funds into the benefit account in the past in order to earn higher interest, and that he cannot tell how much of the benefit fund is principal and how much is accrued interest.

Debtor filed its Chapter 11 Plan of Reorganization and Disclosure Statement on October 24, 2012.  Attached to the Disclosure statement are the Havre Eagles Bylaws, its 2009 federal tax form 990, its balance sheet previous year comparison of April 30, 2011, and April 30, 2012, and a Liquidation Analysis showing $33,412 in cash available from the liquidation of Debtor's real property, liquor license and other assets[6].  Farnham testified that he prepared the profit and loss statement attached to the Disclosure Statement, but that other information came from information Debtor's attorney received from the appraiser Bill Ferro, DA Davidson statements and bank statements from Independence Bank, and the national Eagles organization.  The Court conditionally approved the Disclosure Statement and scheduled the hearing on final approval by Order entered on October, 24, 2012.  Also on October 24, 2012, Debtor filed its objection to Groven's Proof of Claim No. 2, on the grounds that her judgment lien should be set aside as a preferential transfer and the value of the real estate securing her claim is overstated[7].

Debtor's Plan classifies claims into three classes:  Class One is the allowed secured

---

[6]Groven's attorney requested the Court take judicial notice that the Liquidation Analysis filed with the Disclosure Statement on October 24, 2012, was filed before the Debtor filed its amended Schedules on November 30, 2012.

[7]Based on the Judgment entered in Adv. No. 12-27, the Court sustained Debtor's Objection by Order entered on March 14, 2013, disallowed Groven's secured claim, and allowed Groven's Claim 2 as an unsecured nonpriority claim.  Dkt. 113.

13

claim[8] of Independence Bank; Class Two is the allowed unsecured nonpriority claim of Groven;

and Class Three consists of holders of allowed unsecured nonpriority claims of less than

$10,000.  As a nonprofit Debtor has no equity security holders or shareholders.

The Plan provides for payment of Class One claim in equal monthly installments paid

with interest of 5% per annum over 240 months until paid in full.  The Plan provides that

Groven's Class Two claim shall be paid $33,412 payable at the rate of $3.25% per annum in 10

equal annual installments of $3,391.17 with the first payment due one year after the effective

date, with Groven's judgment to be void, discharged and unenforceable on the effective date.  On

cross examination Farnham testified that the amount of funeral benefits held in trust exceed the

amount to be paid to Groven under the Plan.

The Plan provides that Class Three claims will be paid in full without interest within 90

days of the effective date of the Plan.  Farnham testified that the Debtor will have the ability to

make those payments within 90 days.  All of the unsecured nonpriority claims other than

Groven's[9] are Class 3 claims.  Farnham testified that the Debtor needs to pay its trade creditors in

order to continue in business, such as the Capital One credit card the Debtor uses.  Farnham

distinguished Groven's claim from the Class 3 claims because of its much larger amount.

On November 16, 2012, Debtor filed a Stipulation, Ex. 16, with Independence Bank

providing for treatment of that creditor's Class One secured claim under the Plan.  Ex. 16

---

[8]The trust indenture filed with Independent Bank's Proof of Claim No. 1 on May 16, 2012, states that the bank is secured by the real property together with "all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate ...."

[9]The Class 3 claims other than Groven's total $7,748.74.

14

provides for allowance of Class One's claim in the amount of $118,000 payable in monthly payments in the sum of $778.87 for the first 60 months. Farnham testified that the payment is $110 less than the Debtor has been paying Independence Bank and the Debtor has the ability to make that payment to the Class One claim.

Farnham testified that the Debtor has the ability to cut costs and increase income. As an example, he testified that the Debtor can reduce its advertising budget, which Ex. 1 shows runs about $3,496 for 12 months. Farnham testified that the Debtor has had significant legal costs for the past 4 years beginning when Groven filed her complaint with the Montana Human Rights Commission, and incurred annual legal costs of approximately $30,000. That litigation has ended and Debtor will no longer incur those substantial legal fees. Farnham testified that Debtor can increase income from food, and raise rents for events, can reduce the amount of donations, and even reduce contributions to the National Eagles organization as needed to make the required plan payments. He testified that the Debtor has upgraded its facility over the last 10 years and the upgrades are complete, which frees up money for debt service.

On cross examination Farnham admitted that he deposited non-funeral benefit funds in the DA Davidson account reserved for funeral benefits. He testified that the Havre Eagles spent only interest accrued from those accounts, but he admitted that he used some of those funds to pay Debtor's attorney Johnson. On redirect examination, Farnham testified that the Debtor was free to use the interest from the benefit accounts to pay Johnson, but only from the accrued interest, and it did not use any principal from the benefit accounts to pay its attorney. He testified that the amount of total interest accrued varies, and that the interest is periodically reinvested and is included in the principal.

15

Farnham testified that if the instant case is dismissed and Groven proceeds with levy in execution of her judgment the Havre Eagles would have to liquidate, as a result of which all of the Debtor's employees would lose their jobs, the community would lose the ability to hold fund raisers and dinners at the Debtor's bar, and the members would lose the opportunity to attend dinners and dances at the Havre Eagles.  He also testified that if the national organization were to revoke the Debtor's charter all the Debtor's property would revert to the national Eagles.

**James Kato Opinion Testimony on Feasibility.**

Debtor's accountant Kato is a licensed accountant in the State of Montana since 1995. Kato testified that he prepares tax returns for the Havre Eagles, and was asked to review the Debtor's balance sheets and profit and loss statements for the past year to determine whether the Debtor has the ability to make the payments due under Debtor's Plan.  He testified that he does not prepare the Havre Eagles financial statements, but that he reviews its financial statements and profit and loss statements each year, checks them against the Havre Eagles' Quickbooks program, and fills out balance sheets for his preparation of the Debtor's tax returns.  In addition, he testified that every year he checks the Debtor's tax returns against the balances in Debtor's bank statements.

Kato gave his opinion on direct examination that, based on his investigation of the Debtor's historic income and expenses, its last 5 years of tax returns, which he verified by reviewing the Debtor's bank statements, in his opinion the Debtor's Plan is feasible and the Debtor has the ability to pay the secured claim owed to Independence Bank, the $3,391.17 annual payment to Groven, and other payments under the Debtor's Plan.  Kato testified that he followed professional standard methodology for evaluating a party's ability to service debt.

16

Kato testified that, based on his review of the last 5 years of Debtor's tax returns, he arrived at the Debtor's profits and losses.  Ex. 2 is a profit and loss comparison of June 2011 through May 2012, which Kato testified was one of the source documents he used to form his opinion.  On cross examination Groven's attorney asked Kato about a large discrepancy between Ex. 1 and Ex. 2 regarding the expenses and net income for the period from June 2009 to May 2010.  Ex. 2 shows on page 3 a net income loss in the amount of $116,183.73 for that period.  Ex. 1 shows a net revenue less expenses for the period from June 2009 to May 2010 in the amount of minus $12,655.76.  Kato explained that discrepancy comes from the building repairs account. Havre Eagles incurred a large amount of expenses making improvements to its building in that year which Kato capitalized instead of treating as an expense.

Further explaining his opinion that the Debtor has the ability to make the payments required under the Plan, Kato testified that during the previous 3 years the Debtor incurred significant legal fees which he does not anticipate it will continue incurring if the Plan is confirmed.  The Debtor took losses writing off Montana Power stock last year, which will not recur, and as a result Kato testified that the Debtor now has a positive cash flow to make debt service which makes Debtor's Plan feasible.

**J. T. Korkow Opinion Testimony on Feasibility.**

Korkow is a consultant who the Debtor employed as a professional to aid in its restructuring.  He testified that he reviewed the Disclosure Statement, Plan and liquidation analysis to determine if they were accurate and whether the Debtor's Plan is feasible. Korkow testified that he reviewed Ex. 1, Debtor's historical revenue/expenses for the past 5 years. He testified that during all 5 years the Debtor generated a positive income of more than $6,000 per

17

year, and when he added depreciation back in Havre Eagles has approximately $9,100 in income available to service debt under the Plan. He testified that the Plan requires $9,631 for debt service, which he felt was "not far off" from what is required.

Korkow testified that during the previous 5 years the Debtor performed significant remodeling, repairs and maintenance on the Havre Eagles building and fixtures, which showed up in particular during the last 2 years[10]. Korkow testified that most of the remodeling and repairs are completed, and that Farnham has the knowledge of the Debtor's finances and circumstances and will be able to make the adjustments needed to service the debt under Debtor's Plan.

With respect to the liquidation analysis attached to the Disclosure Statement, Korkow testified that he reviewed it and agreed with the liquidation values for the real property of $132,500, and $62,500 for the liquor license, and that the Debtor and Groven agreed to those values. Korkow testified that the liquidation value for the real property and liquor license in a foreclosure or chapter 7 case should be expected to be fifty percent (50%) of the fair market value, and that for the other assets he expected that in a foreclosure they would bring ten cents on the dollar. Based on his discussion with real estate agents, Korkow testified that he agrees with the values as stated on the Debtor's liquidation analysis. Korkow concluded that the creditors would receive more under Debtor's Chapter 11 Plan than in a Chapter 7 case. Groven's attorney did not cross examine Korkow, and Groven did not call any witnesses. Korkow's testimony therefore is uncontroverted.

---

[10]Ex. 1 shows the depreciation for the period from June 2010 to May 2011 was $11,352.53. From June 2011 to May 2012 depreciation was $13,440.24.

18

## DISCUSSION

Groven objects to final approval of Debtor's Disclosure Statement, and objects to confirmation of Debtor's Plan.  With respect to the Disclosure Statement, Groven contends that it was prepared based on information provided by Farnham, who has a history of providing false testimony under oath and is not credible.  She argues that the Debtor has provided no proof or evidence to verify that the benefit funds are subject to a trust and not property of the estate, and that the Debtor's evidence of valuation of personal property and going concern value of the business is not adequate for her to evaluate and make an informed judgment about Debtor's Plan.

Debtor responds that the Disclosure Statement includes financial and management history based on tax returns, and a liquidation analysis with stipulated valuations which Groven has had the opportunity to evaluate, and is not based only on Farnham's credibility.  With respect to asset values Debtor has submitted amended Schedules and answered questions at the meeting of creditors, and Debtor argues that the liquidation analysis provides what the law requires as to the value of Debtor's business.

A disclosure statement must include "adequate information."  "Adequate information" as defined at § 1125(a) means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." *In re McKay*, 14 Mont. B.R. 296, 298 (Bankr. D. Mont. 1995); *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 725 (Bankr. E.D. Cal.1992).  The definition is somewhat misplaced when dealing with a non-profit like the instant Debtor.

19

Groven argues that the valuations in the Debtor's Disclosure Statement are inaccurate and incomplete. *In re Reilly*, 4 Mont. B.R. 150, 153-55, 71 B.R. 132, 134-35 (Bankr. D. Mont. 1987), this Court discussed case law listing relevant factors for evaluating the adequacy of a disclosure statement. *Quoting In re Metrocraft Pub. Service Inc.*, 39 B.R. 567, 568[11] (Bankr. N.D. Ga. 1984); and *In re Fierman*, 21 B.R. 314, 315 (Bankr. E.D. Pa. 1982). This Court noted that "the disclosure statement, settled on a case-by-case basis, must contain factual support of the opinions contained in the disclosure statement." *Reilly*, 4 Mont. B.R. at 155, 71 B.R. at 135. Later the Ninth Circuit Bankruptcy Court of Appeals ("BAP") noted that the determination of what is adequate information is subjective, made on a case by case basis, and is largely within the discretion of the bankruptcy court. *In re Brotby*, 303 B.R. 177, 193 (9th Cir. BAP 2003), *quoting in re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).

In a Chapter 11 case, before confirmation a "court does not conduct an independent

---

[11]*Metrocraft* states that the relevant factors for evaluating the adequacy of a disclosure statement may include: (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectibility of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the Debtor; and (19) the relationship of the debtor with affiliates. 39 B.R. at 568; *Reilly*, 4 Mont. B.R. at 154, 71 B.R. at 134. However, disclosure of all factors is not necessary in every case. *Metrocraft*, 39 B.R. at 568; *Reilly*, 4 Mont. B.R. at 154, 71 B.R. at 134.

investigation and relies upon its reading of the document for apparent completeness and intelligibility," *Brotby*, 303 B.R. at 194, quoting *Michelson*, 141 B.R. at 719.  Having reviewed Debtor's Disclosure Statement and attachments, the Court finds and concludes that it satisfies § 1125(a)(a) and provides adequate information, and that Groven's objections are not well taken.

Groven alone objected to approval of the Disclosure Statement.  None of the other creditors objected, and neither did the Office of U.S. Trustee object on the grounds that it failed to provide adequate information.  The Disclosure Statement is accompanied by the Debtor's Bylaws and tax documents, the latter of which was prepared by a CPA Kato, and a liquidation analysis which contained mainly stipulated valuations.  Groven objects that the Disclosure Statement does not provide adequate information to enable her to make an informed judgment on the Plan. Ultimately, however, Grover demonstrated that she was able to make an informed judgment as shown by the fact that she submitted a ballot.  The Court will grant final approval to the Disclosure Statement[12].

Groven objects to confirmation on the grounds the Plan is not proposed in good faith, that Farnham is not a reliable source of information and the information submitted is inaccurate and incomplete with respect to the valuation of personal property, that the plan fails to satisfy the "best interests of creditors" requirement of 11 U.S.C. § 1129(a)(7) based on the amounts on deposit in the "trust" accounts, inaccuracies in the valuation of personal property and lack of going concern valuation, that the Plan is not feasible because it is "very likely that Farnham will sexually harass" more female employees, that the Plan does not meet the "cramdown" requirements of §

---

[12]The Debtor will, however, be required to file an amended Schedule B to list the 4 "altars" which Farnham admitted were omitted from the amended Schedules.

1129(a)(8) or the absolute priority rule, citing *In re Indian National Finals Rodeo Inc.*, 453 B.R. 387, 401 (Bankr. D. Mont. 2011).

Debtor responds that the details behind Groven's claim are "salacious" and not relevant to its reorganization, that its Plan is proposed in good faith based on the totality of the circumstances notwithstanding the adverse impact on Groven's claim, that Debtor's professionals not Farnham drafted Debtor's Plan, that Debtor's Schedules have been amended to correct the personal property valuations, that the trust monies are not property of the estate, that the Plan's treatment of Groven's claim in a separate class is not unfair, that the small payments to officers of the Debtor or trust monies do not constitute an equity interest in violation of the absolute priority rule, and that Debtor is not suspended or dissolved creating an equity interest in the Debtor's property in favor of the Grand Aerie.

As a preliminary matter the Court has disallowed Groven's secured claim, and allowed it as an unsecured nonpriority claim as a result of the decision in Adv. No. 12-27. Second, a proceeding to determine the extent of a lien or other interest in property requires an adversary proceeding. F.R.B.P. 7001(2). Debtor's Ex. 11 was admitted into evidence without objection. Ex. 11 is the Grand Aerie Statutes, and Section 111.3(b) provides: "All moneys deposited in the Benefit Fund shall be trust funds ...." Section 111.3(b) corroborates Farnham's testimony that the funds in the trust account are held in trust. Groven offered no evidence to the contrary. Based on the uncontroverted evidence this Court finds that the funds in the trust accounts are trust funds and not property of the estate for purposes of the "best interests of creditors" test or other confirmation requirements.

Next, Groven objects that her claim has been unfairly classified separately. Section 1122

22

does not include the phrase "may not discriminate unfairly" which is found in 11 U.S.C. §

1322(b)(1).  Section 1122 provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim
> or an interest in a particular class only if such claim or interest is substantially
> similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every
> unsecured claim that is less than or reduced to an amount that the court approves
> as reasonable and necessary for administrative convenience.

Basic statutory construction states that where Congress includes particular language in one

section of a statute but omits it in another, it is generally presumed that Congress acts intentionally

and purposely in the disparate inclusion or exclusion.  *Keene Corp. v. United States*, 508 U.S. at

208, 113 S.Ct. at 2040.  Thus, if Congress had intended to include the phrase "may not

discriminate unfairly" in § 1122(a), it would have included it.  Since Congress did not include the

phrase in § 1122(a), this Court will not infer its inclusion.

This conclusion is buttressed by another tenet of statutory construction which states that

courts should disfavor interpretations of statutes that render statutory language superfluous, and so

long as there is no positive repugnancy between two laws, a court must give effect to both.

*Connecticut National Bank v. Germain*, 503 U.S. 249, 252-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d

391 (1992).  Both § 1122 and the phrase "may not discriminate unfairly" are found in §

1322(b)(1):  "[T]he plan may – (1) designate a class or classes of unsecured claims, as provided in

section 1122 of this title, but may not discriminate unfairly against any class so designated ...."  If

§ 1122 were construed to include the phrase "may not discriminate unfairly" then the repetition of

the phrase in § 1322(b)(1) following the reference to § 1122 would be redundant and superfluous.

Accordingly, this Court does not find the phrase or requirement that a plan may not discriminate

23

unfairly within the text or meaning of § 1122.

Groven objects to the separate classification of her claim from the other unsecured creditors.  Debtor argues that its Plan's discrimination is fair because there are reasonable, nondiscriminatory reasons for it, namely that without the discrimination it cannot pay trade creditors and remain in business, and would be unable to perform under the Plan if it fails to remain in business.  The United States District Court for the District of Nevada explained classification of claims under § 1122(a) in *Zante, Inc. v. Delgato (In re Zante, Inc.)*, 467 B.R. 216 (D. Nev. 2012):

> Apart from an administrative-convenience exception that does not apply in this case, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Whether claims are "substantially similar" under 11 U.S.C. § 1122(a) is a question of fact; a bankruptcy court has broad latitude in making this determination, which is reviewed for clear error. *In re Johnston*, 21 F.3d 323, 327 (9th Cir.1994).

> Section 1122(a) requires only that claims must be "substantially similar" to be placed into the same class, i.e., it prevents dissimilar claims from being placed into the same class, but it does not prevent substantially similar claims from being placed into different classes. 7 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* § 1122.03[1], at 1122–6 to 1122–7 (Matthew Bender & Co., Inc. 2011) (citing *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir.2002)). "To the contrary, the bankruptcy court has substantial discretion to place similar claims in different classes." *In re Dow Corning Corp.*, 280 F.3d at 661 (citing *In re U.S. Truck Co.*, 800 F.2d 581, 585 (6th Cir.1986)).

> Section 1122(a) permits substantially similar claims to be classed differently, so long as claims that are not substantially similar are not classed together. See 7 Resnick & Sommer, *Collier on Bankruptcy* § 1122.03 [1], at 1122–6 to 1122–7 (citing *In re Dow Corning Corp.*, 280 F.3d at 661).

Section 1122(b) provides authority for the Debtor's convenience class of claims of less than $10,000 in Class Three.  The Debtor classified Groven's allowed unsecured nonpriority

24

claim into Class Two.  Farnham's testimony that he must pay the trade creditors' claims in order to be able to remain in business and generate income to pay creditors under the Plan is uncontroverted, and was supported by Korkow's expert opinion.  This Court finds that legitimate business justifications exist for the Debtor to classify Groven's claim separately from the Class Three unsecured claims, based mainly on the anticipated future credit and/or services from the Class Three creditors.  *Indian National Finals Rodeo*, 453 B.R. at 400; *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996).

No evidence exists in the record showing that claims which are not substantially similar are classed together.  This Court concludes that it is within its discretion under § 1122(a), as explained in *Zante*, *Barakat*, and Collier, to conclude that the Debtor may place Groven's claim into a different class than the other unsecured nonpriority claims.  *See Zante*, 467 B.R. at 218-19.

Because at least one impaired class of creditors has rejected Debtor's Plan, Debtor is seeking confirmation under 11 U.S.C. § 1129(b), which provides:

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

There are two conditions for a judicial cram down under § 1129(b).  First, all requirements of § 1129(a) must be met, save for the plan's acceptance by each impaired class of claims or interests, *see* § 1129(a)(8).  Secondly, the objection of an impaired creditor class may be overridden only if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." §

1129(b)(1).  As to a dissenting class of impaired unsecured creditors, such a plan may be found to be "fair and equitable" only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(I), or, in the alternative, if "the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property," § 1129(b)(2)(B)(ii).  *Indian National Finals Rodeo*, 453 B.R. at 401; *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 441-42, 119 S.Ct. 1411, 1415-16 (1999).  According to § 1129(b)(2)(C)(ii), a plan is fair and equitable as long as the holder of any interest junior to the dissenting impaired class does not receive any property under the reorganization plan.

Groven argues that the Debtor's Plan fails to satisfy the absolute priority rule because of salaries and payments to officers, and that the National Eagles is an equity holder.  These arguments are unsupported by any evidence.  The uncontroverted evidence shows that the Debtor is a non-profit entity, that the trustees and officers donate their time to the Debtor and mostly waive the small payments provided under the bylaws, and that the Debtor is not suspended or dissolved which would result in the National Eagles obtaining interests in Debtor's property. Based on this Court's reasoning in *Indian National Finals Rodeo*, 453 B.R. at 401, discussing *In re General Teamsters, Warehousemen and Helpers Union, Local 890*, 265 F.3d 869, 873 (9th Cir. 2001), this Court overrules Groven's objection based on the absolute priority rule because the evidence shows that the Debtor is a non-profit and no evidence exists of present ownership or interests in the organization's profit other than the Debtor.

The feasibility requirement is set forth at § 1129(a)(11) which requires that: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further

26

financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan." *In re Harbin*, 486 F.3d 510, 517 (9th Cir. 2007); *Indian National Finals Rodeo*, 453 B.R. at 402; *Prudential Ins. Co. of America v. Monnier Brothers (In re Monnier Brothers)*, 755 F.2d 1336, 1441 (8th Cir. 1985); *In re Roberts Rocky Mountain Equip. Co., Inc.*, 76 B.R. 784, 790 (Bankr. D. Mont. 1987). The Ninth Circuit BAP has defined feasibility as a factual determination, and "as whether the things which are to be done after confirmation can be done as a practical matter under the facts." *In re Jorgensen*, 66 B.R. 104, 108 (9th Cir. BAP 1986), citing *In re Clarkson*, 767 F.2d 417 (8th Cir. 1985); *see also In re Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650, 657 (9th Cir. 1997).

Debtors bear the burden of establishing the feasibility of their plans by a preponderance of the evidence. *Indian National Finals Rodeo*, 453 B.R. at 402; *In re Hungerford*, 19 Mont. B.R. 103, 120, 2001 WL 36211305, *11 (Bankr. D. Mont.), quoting *In re Thomas*, 243 F.3d 959, 963 (8th Cir. 2001); *see also In re Euerle Farms, Inc.*, 861 F.2d 1089, 1091-92 (8th Cir. 1988). The Court has a duty under § 1129(a)(11) to protect creditors against "visionary schemes." *Id.*; *In the Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985). While a reorganization plan's success need not be guaranteed, the Court cannot confirm a plan unless it has at least a reasonable chance of success. *Hungerford*, 19 Mont. B.R. at 120, quoting *Thomas*, 243 F.3d at 963; *Monnier Brothers*, 755 F.2d at 1341.

The feasibility of Debtor's Plan was supported by testimony at the hearing by Farnham, and his opinion was supported by expert opinions of CPA Kato, and consultant Korkow. Groven did not cross examine Korkow, and did not offer any expert witness opinion testimony at the hearing that the Plan was not feasible. Whether or not Farnham is credible, the testimony of Kato

27

and Korkow that the Plan is feasible is uncontroverted.  Groven's argument that the Havre Eagles Club is a popular drinking establishment in Havre supports Debtor's contention that it can generate income in its business to make the Plan payments, in particular by the testimony showing that its remodeling is complete and its post-confirmation attorney fees should be greatly reduced. The Court finds that the Debtor has satisfied its burden to show that its Plan is feasible.

Finally, Groven objects that the Plan is not proposed in good faith.  Section § 1129(a)(3) does not define good faith, but a plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Bankruptcy Code.  *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074–75 (9th Cir.2002); *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 835 (9th Cir. 1989).  The requisite good faith is based on a totality of the circumstances on a case by case basis, taking into account the particular features of each plan.  *Sylmar*, 314 F.3d at 1074, 1075; *see also, Brotby*, 303 B.R. at 197.

Groven argues that the Plan is not proposed in good faith because it pays her claim from Farnham's sexual harassment only ten cents on the dollar while paying other claims in full.  The Ninth Circuit wrote:  "'[T]he fact that a debtor proposes a plan in which it avails itself of an applicable Code provision does not constitute evidence of bad faith.' [*In re PPI Enters., Inc.*, 228 B.R. 339, 347 (Bankr.D.Del.1998)] (citation omitted) (stating that it is not bad faith to take advantage of a particular provision of the Code for the purpose of capping the amount of a creditor's claim)."  *Sylmar*, 314 F.3d at 1075.  More recently, citing *Sylmar* the BAP wrote:  "[A] debtor's lack of good faith cannot be found based solely on the fact that the debtor is doing what the Code allows."  *In re Lepe*, 470 B.R. 851, 862 (9th Cir. BAP 2012), quoting *Drummond v. Welsh (In re Welsh)*, 465 B.R. 843, 854 (9th Cir. BAP 2012).  Debtor classified Groven's claim

28

separately as allowed under § 1122 for the purpose of paying trade creditors, so that it can remain in business to generate money to pay creditors through the Plan.  The foregoing authority prevents finding a lack of good faith based on doing what the Code allows.  *Lepe*, 470 B.R. at 862.

Groven's other evidence of lack of good faith is not sufficient.  The sexual harassment occurred before the date Debtor filed its Chapter 11 petition, and no evidence exists in the record to support Groven's argument that Farnham will repeat his offenses.  Those matters provide no support for a finding that the plan has not been proposed in good faith and not by any means forbidden by law under § 1129(a)(3).  Having considered the totality of the circumstances, the Court finds and concludes that the Plan has been proposed in good faith and not by any means forbidden by law.  *Sylmar*, 314 F.3d at 1074, 1075.

## CONCLUSIONS OF LAW

1.  This Court has exclusive jurisdiction of this Chapter 11 bankruptcy under 28 U.S.C. § 1334(a).

2.  Confirmation of Debtor's Chapter 11 Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

3.  Debtor's Disclosure Statement provides adequate information and satisfies 11 U.S.C. § 1125(a).

4.  Debtor's separate classification of Groven's Class Two claim is permitted under § 1122(a).

5.  Debtor's Plan has been proposed in good faith and not by any means forbidden by law. § 1129(a)(3).

6.  Debtor satisfied the requirement of 11 U.S.C. § 1129(a)(10) that at least one class of

claims that is impaired under the Plan has accepted the Plan.

     7.  The absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii) does not apply to a non-profit entity such as the Debtor in the instant case.

     8.  The Debtor satisfied its burden under 11 U.S.C. § 1129(a)(11) to show that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization.

     9.  The Debtor satisfied all other requirements for confirmation of its Plan under 11 U.S.C. § 1129(a) and (b).

     **IT IS ORDERED** a separate Order shall be entered in conformity with the above overruling Groven's objections; granting final approval of the Debtor's Disclosure Statement and confirming Debtor's Chapter 11 Plan (Dkt. 59); and directing the Debtor to file a further amended Schedule B listing the 4 undisclosed altars and their values.

                           BY THE COURT

                           *Ralph B Kirscher*

                           HON. RALPH B. KIRSCHER
                           U.S. Bankruptcy Judge
                           United States Bankruptcy Court
                           District of Montana